# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 11-5641-GW(FFMx) | Date | October 5, 2012 |
| Title | *David Mango v. City of Maywood, et al.* | | |

Present: The Honorable    GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | Wil Wilcox | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Cindy Panuco<br>Scott Robert Ames | Gina J. Kim<br>Glen E. Tucker<br>Elizabeth Kessel<br>Armineh Megrabyan |

**PROCEEDINGS:**    CROSS-CLAIMANT CITY OF MAYWOOD MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST CROSS-DEFENDANT CITY OF BELL (filed 06/21/12);

DEFENDANTS CITY OF MAYWOOD AND LILIAN MYERS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT (filed 06/21/12)

Court hears oral argument. The Tentative circulated and attached hereto, is adopted as the Court's final ruling. The above-entitled motions are **DENIED.**

Any motions in limine and pretrial documents will be filed by November 16, 2012. The pretrial conference is continued to **November 26, 2012 at 8:30 a.m.**

 

 

| | : | 25 |
|---|---|---|
| Initials of Preparer | JG | |

*Mango v. City of Maywood, et al.*, Case No. CV-11-5641
Tentative Rulings on: (1) Defendants City of Maywood and Lilian Myers' Motion for
Summary Judgment or, in the Alternative, for Partial Summary Judgment, and (2) Cross-
Claimant City of Maywood's Motion for Partial Summary Judgment

## I. BACKGROUND

Presently at issue in this action are two summary judgment motions. The City of
Maywood ("Maywood") and Lilian Myers move for summary judgment on the remaining
claims plaintiff David Mango ("Plaintiff") brought against them: his first claim for breach
of written contract (against Maywood); his seventh claim for violation of California Labor
Code § 1102.5 (against Maywood); his eighth claim for violation of the First Amendment
to the U.S. Constitution, pursuant to 42 U.S.C. § 1983 (against Maywood and Myers); and
his ninth claim for failure to pay the minimum wage (against Maywood). They also argue
that Myers cannot be held liable for punitive damages, among several other issues
subsidiary to the four at-issue claims themselves. In addition, Maywood moves for partial
summary judgment as to its first, second and seventh cross-claims pled against cross-
defendant City of Bell ("Bell"), for breach of contract, express indemnity and declaratory
relief, respectively.

## II. ANALYSIS

### A. Summary Judgment Standards

Summary judgment shall be granted when a movant "shows that there is no
genuine dispute as to any material fact and the movant is entitled to judgment as a matter
of law." Fed. R. Civ. P. 56(a). Summary judgment should be entered against a party
"who fails to make a showing sufficient to establish the existence of an element essential
to that party's case, and on which that party will bear the burden of proof at trial." *Parth
v. Pomona Valley Hosp. Med. Ctr.*, 630 F.3d 794, 798-99 (9th Cir. 2010), *cert. denied*,
131 S.Ct. 2902 (2011). In other words, a moving party *without* the ultimate burden of
persuasion may carry its burden of production on summary judgment by negating an
essential element of the opposing party's claim or defense or by "showing" the opposing
party does not have enough evidence of an essential element of its claim or defense to

carry its ultimate burden of persuasion at trial.[1] *See Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

With respect to a moving party *with* the ultimate burden of persuasion, "to prevail on summary judgment it must show that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Shakur v. Schriro*, 514 F.3d 878, 890 (9th Cir. 2008) (omitting internal quotation marks).

> [If] the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact, the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment[, but instead] must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial.

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing, among other cases, *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). "Summary judgment may be resisted and must be denied on no other grounds than that the movant has failed to meet its burden of demonstrating the absence of triable issues." *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).

The court does not make credibility determinations or weigh conflicting evidence at this stage. *See T.W. Elec.*, 809 F.2d at 630-31. All evidence must be viewed in the light most favorable to the non-moving party. *See Hrdlicka v. Reniff*, 631 F.3d 1044 (9th Cir. 2011), *cert. denied*, 132 S.Ct. 1544 (2012). Thus, "justifiable" inferences are drawn in the non-moving party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Narayan v. EGL, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010).

---

[1] Although the Ninth Circuit has indicated that the latter of these two methods does not allow the moving party to "require the nonmoving party to produce evidence supporting its claim or defense simply by saying that the nonmoving party has no such evidence," *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1105 (9th Cir. 2000), it has also indicated (by way of a parenthetical citation in an *en banc* opinion) that the necessary "showing" can be made by "pointing out through argument...the absence of evidence to support plaintiff's claim," *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (*en banc*) (quoting *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000)). *See also* Schwarzer, Tashima, et al., California Practice Guide: Federal Civil Procedure Before Trial (2011) §§ 14:137-137.1, at 14-46 – 47.

### B. Motion 1

#### 1. Factual Background[2]

Plaintiff began working for Maywood in 1990. *See* Reply by Defendants City of Maywood and Lilian Myers to Plaintiff David Mango's Additional Material Facts Cited in Support of His Opposition to Defendants' Motion for Summary Judgment/Summary Adjudication of Issues ("MRPAF") (Docket No. 96) ¶ 1. He became Maywood's Interim Director of Building & Planning in or around July 2000. *See* MRPAF ¶ 2. The interim tag was removed approximately one year later. *See* MRPAF ¶ 2. He remained in that *position* until August 27, 2010, though Maywood terminated him on June 30, 2010. *See* MRPAF ¶ 2.

Although the foregoing facts are relatively clear, Plaintiff and Maywood dispute whether an August 14, 2007, contract between Plaintiff and Maywood was ever approved of or signed by Maywood. *See* Plaintiff David Mango's Statement of Genuine Issues in Support of Opposition to Defendant City of Maywood and Lilian Myers Separate Statement of Uncontroverted Facts and Conclusions of Law in Support of Motion for Summary Judgment or, in the Alternative, Summary Adjudication ("PSGI") (Docket No. 87-3) ¶ 2; MRPAF ¶¶ 3-4. Neither Plaintiff nor Maywood currently have a copy of any signed August 2007 agreement between Plaintiff and Maywood (though Plaintiff asserts he had one in his office prior to Myers "releasing" him on August 27, 2010 – an event addressed in further detail below). *See* PSGI ¶¶ 4-5; MRPAF ¶ 6. Plaintiff asserts that an unsigned copy of that agreement that he maintains is substantively identical to the signed version he previously had. *See* MRPAF ¶ 6. Maywood acted in accordance with the terms of at least that unsigned version of the agreement between August 2007 and his June 30, 2010 termination from Maywood. *See* MRPAF ¶ 7.

Due to its inability to obtain liability and worker's compensation insurance (and resulting inability to maintain any employees on its payroll), the loss of its City Manager, and a desire to avoid bankruptcy, on June 3, 2010, Maywood entered into a written agreement with Bell, which they amended on June 21, 2010. *See* PSGI ¶¶ 6-7; MRPAF

---

[2] The "Factual Background" sections set forth herein draw from undisputed facts and attempt to describe certain key disputed facts. In addition, the recitation at times presents the facts in the light most favorable to the non-movants, as summary judgment proceedings require.

¶¶ 22-23. Pursuant to that Joint Municipal Services Agreement and its amendment ("the JMSA"), Bell was to provide the general operations of all municipal services to Maywood and the implementation of City Council policies, including but not limited to human resources (all supervision and personnel functions), finance (administration of the fiscal budget and supervision of contract services, overall administration of financial operations, general accounting, grants administration), records management (maintenance of all official records and documents; preparation of agenda packets; certification of city documents), and Building and Safety services. *See* PSGI ¶ 7. Pursuant to the JMSA, Bell would place select Maywood employees on its payroll, with those employees continuing to service Maywood as they had in the past. *See* MRPAF ¶ 23. Bell was to provide "all labor and equipment, as necessary" in providing service to the City of Maywood. *See* PSGI ¶ 8.

Due to the gravity of its situation, on June 30, 2010, Maywood terminated the employment of every one of its employees, including Plaintiff. *See* PSGI ¶ 9. The JMSA's terms and conditions became effective July 1, 2010. *See* PSGI ¶ 8.

Plaintiff was one of the employees Maywood decided to maintain past June 30, 2010, because of his experience and institutional knowledge. *See* MRPAF ¶ 25. Plaintiff continued to report to Angela Spaccia, Maywood's Interim City Manager, even after July 1, 2010. *See* MRPAF ¶ 27. Spaccia became Maywood's Interim City Manager in February 2010, after Maywood's City Manager resigned. *See* MRPAF ¶ 21. She had previously served as Bell's Assistant City Manager, from which she took a paid leave of absence to serve in her new position. *See* MRPAF ¶ 21. Plaintiff does not dispute that Spaccia was not appointed to her interim position by way of any Maywood City Council resolution. *See* PSGI ¶ 16.

Spaccia sought and received approval from Maywood's City Council for Plaintiff to continue as Maywood's Director of Building and Planning, and sought and received approval from Bell's City Manager Robert Rizzo that Bell would hire Plaintiff and place him on Bell's payroll so that Plaintiff could continue working in his same capacity. *See* MRPAF ¶ 25. Plaintiff, Maywood and Bell agreed that a six-month severance provision in Plaintiff's contract with Maywood would be carried over into a new employment contract Plaintiff would have with Bell. *See* MRPAF ¶ 29. An unsigned agreement

4

between Plaintiff and Bell reflects that agreement -- even if it does not *constitute* that agreement -- by way of a provision indicating that "all costs associated with [Plaintiff's] termination will be carried to Maywood as [Plaintiff] agrees to forgo such severance from Maywood at this time." MRPAF ¶ 30.

The parties dispute the extent of Spaccia's authority to bind Maywood in terms of its bearing responsibility for costs associated with the termination of Plaintiff's contract (if any) with Bell. *See* PSGI ¶ 8. They also dispute Spaccia's general authority as Maywood's Interim City Manager through July 31, 2010. *See* PSGI ¶¶ 10, 16, 31. Plaintiff cites evidence supporting the purported fact that Spaccia had all of the duties, authorities and responsibilities of a permanent Maywood City Manager, giving her authority to hire and fire employees on behalf of Maywood. *See* PSGI ¶ 10. Plaintiff also asserts that employees hired by Spaccia to work for Maywood reported to her and were supervised by her. *See* PSGI ¶ 10. Meanwhile, Maywood asserts that all power -- to hire and fire Bell employees assigned to work in Maywood, to determine the rate or method of pay for these employees, to keep employment records for them, to set and control work schedules and working conditions, and to establish conditions upon which the employees would receive payment -- rested with Bell. *See* PSGI ¶ 10. Although Plaintiff asserts that Maywood was his "joint employer," he apparently does not dispute that Bell was responsible for paying his salary and benefits beginning July 1, 2010, that he was required to adhere to Bell's policies, and that he was sworn in as a Bell employee on July 16, 2010. *See* PSGI ¶ 12; MRPAF ¶ 28.

Even after his employment (if any) with Bell beginning July 1, 2010, Plaintiff's assigned work location was still the City of Maywood. *See* PSGI ¶ 13; MRPAF ¶ 27. In late July 2010, Plaintiff informed Spaccia that he had not been paid by Bell. *See* MRPAF ¶ 32. Spaccia told Plaintiff that he should continue working and that she would see to it that he was paid. *See* MRPAF ¶ 32. Plaintiff never heard anything further from Spaccia on this point. *See* MRPAF ¶ 33. As he had with Spaccia, Plaintiff informed a Maywood City Council member, Veronica Guardado, in early August 2010 that he had not been paid in over a month. *See* MRPAF ¶ 34. As had Spaccia, Guardado told him that she would look into it and assured him that he would be paid. *See* MRPAF ¶ 34.

Spaccia remained in her position with Maywood until she resigned on July 31,

2010, at around the time of a scandal involving her, Rizzo and Bell. *See* MRPAF ¶¶ 21, 33. Spaccia stopped coming to work at either the end of July 2010 or the beginning of August 2010. *See* PSGI ¶ 16. Maywood had no City Manager from approximately August 1 through August 12, 2010. *See* MRPAF ¶ 35.

Maywood hired Myers as Interim City Manager on August 13, 2010 (though Plaintiff asserts the interim title did not mean that she did not have full authority to hire and fire employees pursuant to what he refers to as "Measure M"). *See* PSGI ¶¶ 17, 31; MRPAF ¶ 35. Repeating the information he had already given Spaccia and Guardado, on August 13, 2010, as part of a lengthy meeting, Plaintiff told Myers that he had not been paid. *See* PSGI ¶ 19; MRPAF ¶ 35. She informed Plaintiff that she would look into his non-payment, but was unable to reach her contact person at Bell. *See* PSGI ¶ 19; MRPAF ¶ 35.

As of the beginning of Myers's term, a Bell employee named Ana Montoya was directing Maywood's Finance Department as an "accounting manager." *See* MRPAF ¶ 54. Myers also had been in contact with Bell's Interim Chief Administrative Officer, Pedro Carrillo, in August 2010, prior to Plaintiff's termination/release. *See* MRPAF ¶ 54; Myers Depo. (Docket No. 87-2) at 57:10-23, 59:4-12. Carrillo is the individual Myers asserts she attempted to contact at Bell to ascertain whether Plaintiff should be paid and whether Plaintiff was being paid. *See* Myers Depo. at 101:4-11; 101:23-102:2.

In their meeting on August 13, 2010, Plaintiff told Myers that he had done work for and cooperated with an investigation of Maywood by the FBI. *See* PSGI ¶ 20; *see also* MRPAF ¶¶ 10-13, 15-20, 36. According to Plaintiff, he also informed Myers that he felt that "the council was corrupt," that everyone in the organization was "either corrupt or incompetent," and that he would need the day off from work on August 18, 2010, for a meeting with the FBI and U.S. Attorney's Office regarding their investigation of Maywood officials and a contractor, AAE Engineering, Inc. ("AAE"). *See* PSGI ¶¶ 20, 28, 36-37. Myers was visibly stunned and upset by this conversation. *See* MRPAF ¶ 37.

As of that date, Myers asserts that she believed Plaintiff was employed by Bell pursuant to the JMSA. *See* PSGI ¶ 19. Plaintiff contests that assertion, citing to evidence that Myers asked him to do work on behalf of Maywood and to respond to a letter from the Community Development Commission ("CDC") regarding a grant. *See* PSGI ¶ 19.

Myers and Maywood assert that Myers did not ask Plaintiff for a list of or types of projects he was working on, how he was spending his days, or what his ordinary work hours were. *See* PSGI ¶ 29. Myers in fact admits that she gave Plaintiff at least two assignments – to prepare a letter to the CDC and to obtain an extension of time to do so. *See* PSGI ¶ 30. However, Myers asserts that Plaintiff did not complete either task. *See* PSGI ¶ 30; MRPAF ¶ 51. His failure was due, at least in part, to the fact that the CDC would not allow him to sign documents on behalf of Maywood because he was no longer directly employed by Maywood. *See* PSGI ¶¶ 15, 30; MRPAF ¶ 51.

In disputing this point, Plaintiff also emphasizes a declaration Myers asked him to sign (which was filed several days later in unrelated litigation involving the Los Angeles Unified School District) on August 27, 2010 (the same day as his termination/release), which attested to the fact that he was a Maywood employee. *See* PSGI ¶¶ 19, 29; MRPAF ¶¶ 42-43. Specifically, it provided (in part) as follows: "I am the Director of Building and Planning, and am the Chief Building Official for the City of Maywood ('City'). I have worked for the City for 21 years, have served as the Director of Building and Planning for 10 years, and have been the Chief Building Official for 18 years." *See* MRPAF ¶ 43. According to Plaintiff, he reported to Myers while she was Interim City Manager, reported to work at Maywood City Hall, continued to drive the same vehicle that Maywood had provided to him in 2006 or 2007, maintained the same Maywood phone number and e-mail address, the same cell phone that Maywood had provided him, and continued to perform the same functions and duties he had performed for Maywood for the previous ten years. *See* PSGI ¶ 29; MRPAF ¶¶ 27-28.

On August 17, 2010, Myers read an article in the Los Angeles Times, wherein Plaintiff was attributed as stating he had cooperated with an FBI investigation, among other topics he addressed as reported in that article. *See* PSGI ¶¶ 21-22; MRPAF ¶ 38. Plaintiff's job duties with Maywood prior to June 30, 2010, included the approval of applications for a commercial facade improvement grant, one other subject Plaintiff addressed in his comments reported in the L.A. Times article. *See* PSGI ¶¶ 22-23. This facade grant also came up in a discussion between Plaintiff and Myers on August 17, 2010. *See* PSGI ¶ 26. Myers learned about Plaintiff's concerns about a grant to City Councilmember Felipe Aguirre both as a result of Plaintiff's discussions with her and

from having read the August 17 L.A. Times article. *See* PSGI ¶¶ 21-22, 27.

On August 27, two weeks after obtaining her post and first meeting with Plaintiff, Myers decided that Plaintiff's services were no longer needed and informed him of that decision. *See* PSGI ¶ 32; MRPAF ¶¶ 40, 45. The parties offer widely varying reasons for why Myers made that decision and contest whether it amounted to a "termination" or instead simply a "release" of Plaintiff. *See* PSGI ¶¶ 32, 34; MRPAF ¶¶ 40, 48-53. Myers refused to give Plaintiff or the Maywood City Councilmembers (one of whom asked her twice) any reason for her decision regarding Plaintiff, though she reported the fact of her decision to the Maywood City Councilmembers. *See* MRPAF ¶¶ 45-46, 55. Myers asserts that her decision had nothing to do with Plaintiff's conversation with her on August 13. *See* PSGI ¶ 35. Prior to making her decision regarding Plaintiff, Myers did not discuss Plaintiff with any of Maywood's Councilmembers, the City Attorney, or anyone else; and no one told Myers that Plaintiff needed to be "released." *See* PSGI ¶ 37.

No one ever paid Plaintiff for his work between July 1, 2010 and August 27, 2010, and neither Bell nor Maywood paid him six months severance, as he had been entitled to prior to his June 30, 2010, termination from Maywood and as he asserts was carried over past July 1, 2010, pursuant to his agreement with Bell. *See* MRPAF ¶ 41.

Plaintiff did not file a complaint with the California Labor Commission, the California Department of Fair Employment and Housing or the Equal Employment Opportunity Commission. *See* PSGI ¶ 39.

## 2. Was Maywood Plaintiff's Employer After July 1, 2010?

Much of Motion 1 comes down to the question of whether Maywood could be deemed Plaintiff's employer between July 1, 2010, and August 27, 2010. If not, Maywood argues that Plaintiff's seventh, eighth and ninth claims (at least insofar as they involve Maywood) would be fatally flawed. *See* Cal. Lab. Code § 1102.5(b) ("An _employer_ may not retaliate against an _employee_ for disclosing information to a government or law enforcement agency, where the _employee_ has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.") (emphases added); Cal. Lab. Code § 1194 ("[A]ny _employee_ receiving less than the legal minimum wage...applicable to the _employee_ is entitled to recover in a civil action the unpaid balance of the full amount of

this minimum wage....") (emphases added); *see also Narayan v. EGL, Inc.*, 616 F.3d 895, 897 (9th Cir. 2010) (describing provisions of the California Labor Code that "confer[] certain benefits on employees that it does not afford independent contractors," including provisions, such as section 1194, that "require <u>employers</u> to pay overtime compensation") (emphasis added); *Gibson v. Office of Attorney Gen.*, 561 F.3d 920, 925 (9th Cir. 2009) (indicating that court uses "sequential five-step series of questions" in evaluating First Amendment retaliation claim: "(1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the [government] had an adequate justification for treating the <u>employee</u> differently from other members of the general public; and (5) whether the [government] would have taken the adverse <u>employment</u> action even absent the protected speech") (emphases added); *Freitag v. Ayers*, 468 F.3d 528, 543 (9th Cir. 2006); *Martinez v. Combs*, 49 Cal.4th 35, 49 (2010) ("That only an employer can be liable [under Labor Code § 1194] seems logically inevitable as no generally applicable rule of law imposes on anyone other than an employer a duty to pay wages."); *Hansen v. Cal. Dep't of Corrs. & Rehab.*, 171 Cal.App.4th 1537, 1546 (2008) ("[A] prerequisite to asserting a...section 1102.5 violation is the existence of an employer-employee relationship at the time the allegedly retaliatory action occurred."); *Patten v. Grant Joint Union High Sch. Dist.*, 134 Cal.App.4th 1348, 1384 (2005) (indicating that, to establish a *prima facie* case[3] of retaliation in violation of Labor Code section 1102.5(b), "a plaintiff must show (1) she engaged in a protected activity, (2) her <u>employer</u> subjected her to an adverse employment action, and (3) there is a causal link between the two") (emphasis added).

The Court earlier ruled in this case that California Government Code section 40602 and California court decisions interpreting that provision meant that Maywood could be liable to Plaintiff *in contract* only if based on a *written* contract. *See* Docket No.

---

[3] "The elements of a section 1102.5(b) retaliation cause of action require that (1) the plaintiff establish a prima facie case of retaliation, (2) the defendant provide a legitimate, nonretaliatory explanation for its acts, and (3) the plaintiff show this explanation is merely a pretext for the retaliation." *Patten v. Grant Joint Union High Sch. Dist.*, 134 Cal.App.4th 1378, 1384 (2005); *see also Mokler v. Cnty. of Orange*, 157 Cal.App.4th 121, 138 (2007).

45, at 2-5. The seventh, eighth and ninth claims for relief are not necessarily *contract*-based claims for relief; they are simply *employment*-based. Plaintiff directs the Court to various measures for determining that Maywood was still his employer – or at least, along with Bell, his *joint* employer[4] – but the question is whether those doctrines have any purchase in situations involving public entities given the restrictions on employment contracts with public employers falling within Government Code section 40602. If they do, given the preceding factual recitation, there are sufficient triable issues of fact such that the Court could not rule in Maywood's favor at the summary judgment stage with respect to Plaintiff's employment status, if any, with Maywood during the period pertinent to this case.

Even after July 1, 2010, Plaintiff reported to Maywood's interim City Manager, Spaccia, and then to Myers upon her hiring in the City Manager position. When he reported his non-payment to Spaccia, she asked that he keep working, indicating that she would see to his payment. He later obtained the same reassurance from a Maywood City Council member. Moreover, as Plaintiff points out, Myers (and Maywood) asked Plaintiff to perform tasks consistent with an employment relationship between the parties, even on the day Myers "released" Plaintiff from his work for Maywood.

"The essential characteristic of employment relationship [*sic*] is the right to control and direct the activities of the person rendering service, or the manner and method in which the work is performed." *Villanazul v. City of Los Angeles*, 37 Cal.2d 718, 721 (1951); *Bradley v. Cal. Dep't of Corrs. & Rehab.*, 158 Cal.App.4th 1612, 1625 (2008) (recognizing *Villanazul* requirement as a "common-law requirement" that is "the keystone of the employment relationship"). While Maywood argues that Myers had no right to control Plaintiff's activities because there is evidence that Plaintiff did not do at least certain things she asked him to do, this does not change the fact that she asked him to perform certain tasks. That request is (or those requests are) fundamentally inconsistent

---

[4] The Court has already ruled that there are triable issues of fact with respect to whether Plaintiff was *at least* Bell's employee during the post-July 1, 2010, time period. *See* Docket No. 84. It appears as though "joint employer" status is recognized in California in the context of public employers. *See Serv. Employees Int'l Union v. Cnty. of Los Angeles*, 225 Cal.App.3d 761, 772-73 (1990) (indicating that joint employer status among public entities can exist "where both the general employer and the special employer have the right to control the employee's activities").

with the contention that she felt she had no ability or power to make such requests.

There is also no dispute that Myers at least "released" Plaintiff from his work on August 27, 2010. *See Villanazul*, 37 Cal.2d at 721 ("The right to terminate the service at any time is a strong circumstance tending to show the right to control."). Although Maywood and Myers assert that this did not have the effect of "terminating" Plaintiff because of their position that he was only an employee of Bell at that point in time, there is no indication that Plaintiff was performing any work, for Bell or anyone, other than for the benefit of Maywood, as had been true for years. At a minimum, Myers felt she had sufficient "right to control" Plaintiff such that she could inform him he would no longer be working for Maywood's benefit, whether that amounted to a "release" or a "termination."

There is also no evidence that Myers instructed Plaintiff to return to Bell to seek additional non-Maywood-related job duties, as one might presume she would have done had she truly believed that she was not, in effect, "terminating" him from his employment at that stage. Even if Myers ultimately "released" Plaintiff from work on August 27, 2010, at least partially out of a concern that she and Maywood could not continue to let him work on Maywood's behalf, she nevertheless had continued to let him work on Maywood's behalf for two weeks after he informed her that he had not been paid by anyone for the work he had done thus far. Moreover, even before he informed Myers of his non-payment, he had informed both Spaccia and Guardado of this situation as well. They both assured him that he would be paid, and at least Spaccia asked him to continue working while she looked into it.

Furthermore, simply because Maywood was not allowed to have its own employees, because of insurance and/or liability reasons, after the end of June 2010, does not necessarily mean that it *effectively* maintained any safeguards against an employment relationship. In other words, it may have endeavored to prevent having any of its own employees during that time period, but if Plaintiff's "joint employer" or other theory of employment has some effect in this area, it may have been unsuccessful in that regard, either because of the relative control it did have over Plaintiff or because of Bell's failure or inability to do what it needed to do to ensure that Plaintiff was *only* Bell's employee, technically, during that time period.

All of this, combined, would at least raise a triable issue of fact with respect to

11

whether Maywood was Plaintiff's employer – or at least his *joint* employer – under, for instance, the test(s) set forth in the Wage Order and Labor Code provisions discussed in *Martinez* (which would appear to apply to at least Plaintiff's Labor Code section 1194-based claim). Although Maywood cites evidence indicating that Bell always had the "right" to "control" Plaintiff after July 1, the evidence is simply not so one-sided in this regard that the Court can resolve the issue at summary judgment, unless Maywood is correct that Plaintiff simply could not be its employee because of the effect of various authorities, such as Government Code § 40602, placing restrictions upon employment relationships with public employers.

"Public employment in California is, in general, regulated by statute, the rights of a public employee are statutory, and 'no employee has a vested *contractual* right to continue in employment beyond the time or contrary to the terms and conditions fixed by law.'" *Bernstein v. Lopez*, 321 F.3d 903, 905 (9th Cir. 2003) (emphasis added) (quoting *Miller v. State*, 18 Cal.3d 808, 813 (1977)). The Ninth Circuit, recognizing this "long-standing principle of California law," has held that "neither *an express nor an implied contract* can restrict the reasons for, or the manner of, termination of public employment provided by California statute." *Id.* (emphasis added) (citing *Portman v. County of Santa Clara*, 995 F.2d 898, 905 (9th Cir. 1993)).[5]

Nevertheless, it appears that there are a number of cases discussing non-contractual recovery by what appear to be public employees who did not have an employment contract with their public employers. *See, e.g.*, *Bradley*, 158 Cal.App.4th at 1623-27 (concluding that individual was employee under FEHA and applicable regulations even though she had no direct contract of employment and was not hired pursuant to "merit selection process"); *Serv. Employees Int'l Union v. Cnty. of Los Angeles*, 225 Cal.App.3d 761, 769-70 (1990) (looking, in absence of definition of "public employee" in statute obligating local government employers to bargain with representatives of employees regarding terms of employment, to common law understanding of term "employee"); *see also Metropolitan Water Dist. v. Superior Court (Cargill)*, 32 Cal.4th

---

[5] In *Bernstein*, the Ninth Circuit rejected a Fourteenth Amendment due process claim based upon property rights school administrators asserted sprang, not from any statutorily-approved employment contract, but from certain rules of administrative procedure and memoranda of understanding adopted by the governing school board.

491, 496-97, 500-01, 504-06 (2004) (concluding that metropolitan water district was required to enroll in California Public Employee's Retirement System "all workers who would be considered [the water district's] employees under California common law" even though paid by labor suppliers, not the water district itself, because Public Employees' Retirement Law incorporated common law principles into its definition of a contracting agency employee while refraining from deciding whether plaintiffs were the water district's employees "for any purpose other than CalPERS enrollment or whether they are entitled to any benefits as employees under other provisions of law"). In *Bradley*, the California Court of Appeal commented that

> [w]e glean no magic formula for determining whether the requisite employment relationship exists. The prevailing view is to consider the totality of the circumstances, reflecting upon the nature of the work relationship between the parties, and placing emphasis on the control exercised by the employer over the employee's performance of employment duties. Consequently, when a statute fails to define the term "employee," courts routinely look at the common-law definition for guidance, focusing on the amount of control the employer exercises over the employee.

*Bradley*, 158 Cal.App.4th at 1626. Even *contract* rights have been *implied* in the case of certain statutory grants, such as pension benefits. *See Creighton v. Regents of Univ. of Cal.*, 58 Cal.App.4th 237, 242-43 (1997).

Apart from repeating the rule mentioned above – that, in general, public employment is governed by statute, not contract – Maywood relies, to a large degree, on *Mendoza v. Town of Ross*, 128 Cal.App.4th 625 (2005), for its position that Plaintiff cannot maintain any form of employment-based claim where the applicable statutory provisions for public employment were not followed.[6] In *Mendoza*, a disabled school volunteer brought (among other claims) a FEHA claim for disability discrimination and an additional claim for wrongful termination in violation of public policy. *See id.* at 628-30. The California Court of Appeal concluded that the plaintiff did not fall within the definition of "employee" as contained in "regulations enacted by the Department of Fair

---

[6] Plaintiff does not assist with the analysis here by simply ignoring *Mendoza*.

Employment and Housing...to implement the FEHA." *Id.* at 632.

But *Mendoza* is apparently in conflict with *Bradley* in that respect even within the context of a FEHA claim (which is not at issue here).[7] Although the *Mendoza* court considered whether the plaintiff had been "appointed" to his volunteer position in compliance with the local ordinance specifying how "appointments to employment" are to be made, it engaged in that analysis only because the plaintiff had argued – under the regulations' definition of "employee" – that he had been so "appointed." *See id.* at 632-33. It did not stem from a threshold conclusion – analogous to Maywood's argument here – that the plaintiff *had to have been appointed* in order to be considered an employee. Indeed, insofar as *Bradley* did not employ the regulations' definition of "employee" at all, the question of a "proper appointment" would not have even come up in that case. Similarly, because *Bradley* worked under a more malleable understanding of the definition of "employee,"[8] the analysis of whether there was an "implied contract of employment" in *Mendoza* (which looked to the regulatory definition of "employee") meant nothing to *Bradley*.

Crucially, *Mendoza* jumped from observing that "[n]o person has a *contractual* right to enter into or to continue in public employment except in accordance with express terms and conditions fixed by law," *id.* at 634 (emphasis added), directly to concluding that, "as a matter of law, in order for Mendoza to allege *any type of employment-based action*, whether it is wrongful termination or disability discrimination, [he] must sufficiently allege that he was employed or appointed in accordance with the applicable statute or ordinance," *id.* (emphasis added). The other cases cited and discussed herein might be taken to suggest that the *Mendoza* court "leapt" before it "looked." No case appears to have cited *Mendoza* for the broadly-worded conclusion it reached.

---

[7] *Bradley* distinguished *Mendoza* based on the fact that the plaintiff in the latter was a volunteer. *See Bradley*, 158 Cal.App.4th at 1626 n.2. In that regard, this case is *Bradley*, not *Mendoza*.

[8] In fact, *Bradley* considered the regulation that *Mendoza* dealt with, but effectively dismissed that portion of it relied upon in *Mendoza* for purposes of its own analysis: "Nothing in this regulation mandates that the contract of employment be direct or that persons working for the state are only employees for purposes of the FEHA if hired pursuant to the merit selection process." *Bradley*, 158 Cal.App.4th at 1625. Instead, *Bradley* emphasized the regulation's inclusion within its definition of "employee" "the common-law requirement that the employer exercise discretion and control over the person's work – the keystone of the employment relationship." *Id.*

Aside from reasoning inferentially from *Mendoza*, Maywood does not appear to direct the Court to any decision addressing whether or not an "employee" of a public entity for purposes of a Labor Code or Section 1983 claim must have a valid *contract*-based employment relationship with the public employer, as that relationship is understood under California law. In the absence of some statutory definition, courts have looked to a broad range of sources in identifying public employment status. *See Lucero v. Hart*, 915 F.2d 1367 (9th Cir. 1990) (commenting, in section 1983 case based upon alleged violation of due process rights, that entitlements giving rise to property interest in a benefit may be "based on rules aris[ing] from statutes, ordinances, regulations or express or implied contracts"); *Baraka v. McGreevey*, 481 F.3d 187, 205 n.14 (3d Cir. 2007) (looking to New Jersey law to determine whether individual was a public employee for purposes of his procedural due process claim); *Farthing v. City of Shawnee*, 39 F.3d 1131, 1135 (10th Cir. 1994) (indicating that "[a] legitimate claim of entitlement" – for purposes of a protectable property interest – "may be grounded in various sources of state law, including 'state statutes, local ordinances, established rules, or mutually explicit understandings'") (quoting *Dickeson v. Quarberg*, 844 F.2d 1435, 1437 (10th Cir. 1988)); *see also Rowen v. Santa Clara Unified Sch. Dist.*, 121 Cal.App.3d 231, 234-35 (1981) (noting that Ralph M. Brown Act – requiring open and public meetings for legislative bodies of public agencies, but which includes exception for appointment, employment, or dismissal of a "public employee" – does not define "public employee" except by way of exclusion and example, but that "[t]he distinction between employees and independent contractors is well established...and presumptively known to the Legislature").

Because Maywood has presented this Court with nothing more convincing than the unexplained, unsupported and apparently unfollowed statement in *Mendoza*, it cannot conclude, as a matter of law, that Plaintiff could not be considered Maywood's employee between July 1, 2010 and August 27, 2010. In the end, if Maywood were correct that it could not be considered Plaintiff's employer after July 1, 2010, the Court would face a situation where no one disputes that an individual worked on behalf of Maywood, but because of the technicalities concerning public employment and/or one or more municipal government's oversights, incompetence, or worse, that individual may have no recourse, in terms of the compensation otherwise unquestionably owed to him and/or violations of

his California and Federal statutory and Constitutional rights.

### 3. Claim One – Breach of Written Contract

Plaintiff's first claim for relief is not affected by resolution of the foregoing issue, because it concerns the time period preceding June 30, 2010, when Plaintiff asserts he was operating pursuant to a *written contract* with Maywood – an allegation that survived the Court's earlier ruling on the effect of Government Code section 40602 and California court decisions interpreting that provision. Here, Maywood's argument is that Plaintiff cannot survive summary judgment on this claim because he has not produced a *signed copy* of that contract and, therefore, has (in its view) no evidence that such a contract ever existed.[9] Plaintiff does, however, have *other* evidence that he had a signed, written contract with Maywood that had been formally approved in August 2007.

Certainly the Federal Rules of Evidence contemplate a situation like this. Rule 1004 provides as follows:

> An original is not required and other evidence of the content of a writing…is admissible if:
>
> (a) all the originals are lost or destroyed, and not by the proponent acting in bad faith;
> (b) an original cannot be obtained by any available judicial process;
> (c) the party against whom the original would be offered had control of the original; was at that time put on notice, by pleadings or otherwise, that the original would be a subject of proof at the trial or hearing; and fails to produce it at the trial or hearing; or
> (d) the writing, recording, or photograph is not closely related to a controlling issue.

Fed. R. Evid. 1004; *see also* Fed. R. Evid. 1008 (indicating that, in a jury trial, "the jury determines…any issue about whether…an asserted writing…ever existed…or…other evidence of content accurately reflects the content"); *United States v. Gerhart*, 538 F.2d 807, 809 (8th Cir. 1976) ("[O]nce an enumerated condition of Rule 1004 is met, the

---

[9] Considering its insistence elsewhere in this litigation that Plaintiff could only have a contract-based claim if such contract was in writing and that there is no dispute that Plaintiff worked – and was paid – *for years* by Maywood, it is at least somewhat strange that Maywood is now, at least implicitly, taking the position that it in fact had no contractual obligation to pay Plaintiff for at least much of that time because it insists he in fact had no such signed, written contract.

proponent may prove the contents of a writing by any secondary evidence, subject to an attack by the opposing party not as to admissibility but to the weight to be given the evidence, with final determination left to the trier of fact."); *id.* at 809 n.2 (indicating that any kind of secondary evidence is permissible once Rule 1004's conditions are met, "ranging from photographs and handwritten copies to oral testimony of a witness whose credibility is suspect") (quoting 5 J. Weinstein, Evidence P 1004(01), at 1004-4 1004-5 (1975)). Plaintiff has explained why he has been unable to produce the original signed contract in question (or a duplicate thereof), and there is no indication that his inability to produce it stems in any way from his own bad faith. Moreover, it is conceivable that even Rule 1004(c) would apply here if one is inclined to believe Plaintiff's account of the signed contract's demise.

Consistent with Rules 1004 and 1008, "there is no general rule that proof of a fact will be excluded unless its proponent furnished the best evidence in his power." *Simas v. First Citizens' Fed. Credit Union*, 170 F.3d 37, 51 (1st Cir. 1999). The Court therefore rejects Maywood's argument/motion in this regard. *See also Paul Revere Variable Annuity Ins. Co. v. Zang*, 81 F.Supp.2d 227, 230 (D. Mass. 2000) (rejecting argument that plaintiff needed to produce original document to show arbitration agreement existed – "Paul Revere can prove that Beck signed a registration application, including the Form A-300, without producing the actual form."), *aff'd*, 248 F.3d 1, 9-10 (1st Cir. 2001); *MAPCO Alaska Petroleum, Inc. v. Central Nat'l Ins. Co. of Omaha*, 795 F.Supp. 941, 948 (D. Alaska 1991) (admitting evidence supporting existence of insurance policy where it consisted, *inter alia*, of certificate of insurance referencing the subject policy, cover letter from broker indicating policy was in effect and invoices evidencing payment of premiums).

> ### 4. Assuming an Employment Relationship, can Maywood be liable for a Section 1102.5 Violation?

Maywood also argues that it cannot be held liable in damages for any Labor Code section 1102.5 violation because of the effect of California Government Code section 815. Government Code section 815 provides as follows:

> Except as otherwise provided by statute:
>
> (a)     A public entity is not liable for an injury, whether

> such injury arises out of an act or omission of the public
> entity or a public employee or any other person.
>
> (b)     The liability of a public entity established by this
> part (commencing with Section 814) is subject to any
> immunity of the public entity provided by statute, including
> this part, and is subject to any defenses that would be
> available to the public entity if it were a private person.

Cal. Gov't Code § 815. In response, Plaintiff directs the Court to several cases upholding

damages awards against public entities for section 1102.5 violations. *See Lloyd v. Cnty. of*

*Los Angeles*, 172 Cal.App.4th 320 (2009); *Gardenhire v. Housing Auth.*, 85 Cal.App.4th

236 (2000). He also notes that no court appears to have adopted Maywood's position on

this issue. *Eastburn v. Regional Fire Protection Authority*, 31 Cal.4th 1175 (2003), which

considered whether California Civil Code § 1714 (imposing, as the *Eastburn* court

recognized, only "a general duty of care on all persons," *id.* at 1180) provided for

governmental liability, is not sufficient authority in this regard.

In *Lloyd*, the California Court of Appeal barred a *"Tameny"* claim – in essence, a

claim for wrongful termination in violation of public policy – based, in part, upon the

public policy established by Labor Code § 1102.5. *See Lloyd*, 172 Cal.App.4th at 329.

But a *Tameny* claim is a *common law* tort claim, not a statutory claim excepted by section

815. The *Lloyd* court did not bar the plaintiff from proceeding on his section 1102.5

claim, but instead reached the merits of the claim. *See id.* at 331-32. An action against a

public employer directly under section 1102.5 is therefore viable. *See also Imel v. Cnty.*

*of El Dorado*, No. 2:10-CV-0688 FCD EFB, 2010 U.S. Dist. LEXIS 64379, *8-9 (E.D.

Cal. June 28, 2010); *Thornbrough v. W. Placer Unified Sch. Dist.*, No. 2:09-cv-02613-

GEB-GGH, 2010 U.S. Dist. LEXIS 53136, *40-42 (E.D. Cal. May 27, 2010).

### 5. Was Plaintiff Obligated to Exhaust His Section 1102.5 Claim with the Labor Commissioner?

Maywood also argues that Plaintiff can have no claim against it under section

1102.5 because he did not exhaust that claim with the California Labor Commissioner.

Labor Code section 98.7 provides, in part, that "[a]ny person who believes that he or she

has been discharged or otherwise discriminated against in violation of any law under the

jurisdiction of the Labor Commission may file a complaint with the division within six

months after the occurrence of the violation." Cal. Lab. Code § 98.7(a) (emphasis added). Plaintiff argues that any exhaustion contemplated by section 98.7 is permissive only, and that Maywood relies on no binding authority holding it to be other than that, but instead relies on inferential reasoning from *Campbell v. Regents of University of California*, 35 Cal.4th 311 (2005) (insofar as that case involves exhaustion of internal administrative procedures), and a handful of federal district court decisions. *Lloyd* again provides support for Plaintiff's position on this issue. *See Lloyd*, 172 Cal.App.4th at 331-32 (rejecting argument that exhaustion pursuant to section 98.7 is prerequisite to maintenance of section 1102.5 claim – "it would appear Labor Code section 98.7 merely provides the employee with an additional remedy, which the employee may choose to pursue"). Tasked with predicting how the California Supreme Court would rule on this question, Plaintiff argues the Court should reject Maywood's analysis. Maywood and Myers respond that *Lloyd* stands alone and has been criticized for not attempting to reconcile the California Supreme Court's decision in *Campbell*.

In light of *Lloyd* and the plain *permissive* language of section 98.7(a), the Court concludes that exhaustion under section 98.7 is not a prerequisite to a section 1102.5-based action. Although federal district courts have differed with this conclusion, *see, e.g.*, *Ferretti v. Pfizer Inc.*, 855 F.Supp.2d 1017, 1022-24 (N.D. Cal. 2012), others have sided with it.[10] *See, e.g.*, *Turner v. City & Cnty. of San Francisco*, No. C-11-1427 EMC, 2012 U.S. Dist. LEXIS 123161, *18-31 (N.D. Cal. Aug. 29, 2012) (Chen, M.J.); *Creighton v. City of Livingston*, CV-F-08-1507 OWW/SMS, 2009 U.S. Dist. LEXIS 93720, *6-34 (E.D. Cal. Oct. 7, 2009); *see also* Chin, Cathcart, et al., California Practice Guide: Employment Litigation (2010) § 16:333, at 16-48.3; *id.* § 16:493.6, at 16-77. In addition, there are no California decisions requiring exhaustion of a section 1102.5 claim under section 98.7. *Campbell* involved exhaustion of *internal* administrative procedures, as the opening paragraph of that decision makes clear, and makes no mention of section 98.7. *See Campbell*, 35 Cal.4th at 317, 321-22.

The Court therefore rejects Maywood's argument on this point.

### 6. Did Plaintiff Suffer an Adverse Employment Action?

---

[10] A Westlaw search reveals no Central District decisions discussing this issue.

For purposes of his section 1102.5 and section 1983 claims (assuming they survive the question of Plaintiff's employment by Maywood discussed above), Maywood also argues that Plaintiff suffered no adverse employment action, a necessary element of both claims. *See Mokler v. Cnty. of Orange*, 157 Cal.App.4th 121, 138 (2007) ("To establish a prima facie case of retaliation a plaintiff must show (1) she engaged in a protected activity; (2) her employer subjected her to an adverse employment action; and (3) there is a causal link between the two."); *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009) (including, as elements of First Amendment retaliation claim in public employment context, "whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action" and "whether the state would have taken the adverse employment action even absent the protected speech").

"To constitute an adverse employment action," for purposes of a section 1983 claim, "a government act of retaliation need not be severe and it need not be of a certain kind." *Coszalter v. City of Salem*, 320 F.3d 968, 975 (9th Cir. 2003); *see also Dahlia v. Rodriguez*, 689 F.3d 1094, 1107 (9th Cir. 2012) (concluding that, "under some circumstances, placement on administrative leave can constitute an adverse employment action"). The appropriate inquiry is "whether 'the exercise of the first amendment rights was deterred' by the government employer's action." *Coszalter*, 320 F.3d at 975 (quoting *Allen v. Scribner*, 812 F.2d 426, 434 n.17 (9th Cir. 1987)). The concept for purposes of a section 1102.5 claim has a similarly liberal expanse. *See Patten*, 134 Cal.App.4th at 1387-88 (adopting, for purposes of section 1102.5 claim, definition of "adverse employment action" from FEHA context, such that the adverse action must "materially affect[] the terms and conditions of employment" and it "encompasses not only ultimate employment decisions, 'but also the entire spectrum of employment actions that are reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement in his or her career'") (quoting *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal.4th 1028, 1036, 1050-61 (2005)).[11]

Even if the Court assumes that Plaintiff was not "terminated" or *de facto*

---

[11] Contrary to the suggestion in Maywood's and Myers's Reply brief, *Kowalski v. Shell Oil Co.*, 23 Cal.3d 168 (1979), has nothing to do with what constitutes an adverse employment action.

terminated by way of Myer's August 27 decision, his "release" from doing the only work he had been performing or, to his or anyone else's knowledge, had been tasked with performing, could still conceivably constitute an adverse employment action. The Court therefore rejects Maywood's argument on this point.

### 7. *Monell* Liability for Section 1983 Claim?

Maywood and Myers also argue that Plaintiff can have no *Monell*[12] liability claim against Maywood (nor an official capacity claim against Myers, the functional equivalent thereof) because the incident involving him was but a single incident.

However, as Maywood and Myers must admit, a single incident is sufficient for *Monell* liability where a municipal policymaker makes a "conscious, affirmative choice" in a particular (unconstitutional) regard. *Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir. 1992); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) ("We hold than municipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.").

> If the decision to adopt that particular course of action is properly made by that government's authorized decision-makers, it surely represents an act of official government "policy" as that term is commonly understood. More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly. To deny compensation to the victim would therefore be contrary to the fundamental purpose of § 1983.

*Pembaur*, 475 U.S. at 481. Myers had final decision-making authority, at least with respect to her decision to "release" Plaintiff. To do what she did to Plaintiff on August 27, 2010, whether it should be considered "releasing" him or terminating him, Myers found no occasion to discuss her action with anyone else.

"*Pembaur* requires that an official policymaker make a deliberate choice from among various alternatives to follow a particular course of action." *Gillette*, 979 F.2d at 1348. While Maywood and Myers argue that Myers had no alternative but to release

---

[12] *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

Plaintiff out of a concern that he might otherwise be seen as Maywood's employee, Myers had already been "suffering" or "permitting" Plaintiff to work for two weeks before that date (as had Spaccia before Myers). If a factfinder takes Plaintiff's view of the events, Myers would essentially be arguing that she was forced to violate Plaintiff's Constitutional rights because the delay in clarifying Plaintiff's working arrangements was no longer tenable, a position that a factfinder could easily discount.

For these reasons, the Court rejects Maywood's argument.

### 8. Did Plaintiff Engage in Protected Activity?

Maywood and Myers also argue that Plaintiff never engaged in any protected activity sufficient to implicate the protections afforded by section 1102.5, the First Amendment and section 1983. Again, when considering "whether an employer impermissibly retaliated against an employee for protected speech," courts address "a sequential five-step series of questions": (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech. *See Anthoine v. N. Cent. Cntys. Consortium*, 605 F.3d 740, 748 (9th Cir. 2010); *Eng*, 552 F.3d at 1070.

A substantial part of the argument here (if not the entirety of the argument) is based on the Supreme Court's decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), and is therefore properly understood as a challenge to Plaintiff's ability to demonstrate the second of the five above-listed questions employed in the context of a First Amendment retaliation claim brought by a public employee. *See Anthoine*, 605 F.3d at 748-50. Whether or not Plaintiff may have had some job duty-based obligation to inform Myers of his views, or to "educate" her thereon (a position that is, by the way, inconsistent with the view that Plaintiff was, under no circumstances, Maywood's employee at the time), there is nothing to suggest that Plaintiff had any job-duty-based obligation to speak to the Federal Bureau of Investigation or U.S. Attorney's Office about his concerns. *Cf. Trigillo v. Snyder*, 547 F.3d 826, 830 (7th Cir. 2008) (avoiding issue of whether state department

of corrections' procurement manager's report to FBI about procurement practices was within scope of duties because there was no evidence that decisionmaker knew plaintiff was the person who called the FBI); *compare Dahlia*, 689 F.3d at 1102-07 (9th Cir. 2012) (discussing *Huppert v. City of Pittsburg*, 574 F.3d 696 (9th Cir. 2009)).

"Summary judgment is…inappropriate where…(1) Plaintiff has spoken on a matter of public concern, (2) the state lacks an adequate justification for treating the employee differently from any other member of the general public, and (3) there is a genuine and material dispute as to the scope and content of plaintiff's employment duties." *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1123 (9th Cir. 2008); *see also Robinson v. York*, 566 F.3d 817, 823 (9th Cir. 2009). Because Maywood and Myers have not demonstrated that Plaintiff spoke entirely within the scope of his job duties, they may not prevail at summary judgment on this argument.

### 9. Would Maywood/Myers Have Made the Same Decision Irrespective of Such Protected Activity?

Citing a number of reasons why Myers felt that Plaintiff was no longer suited for his work for Maywood, Maywood and Myers argue that the decision to relieve him of his duties would have been taken irrespective of any protected speech he may have engaged in. Within the context of Plaintiff's section 1983 claim, this is the fifth of the five questions *Eng* contemplates.

The burden on this question rests with Maywood, both with respect to Plaintiff's Labor Code claim and his section 1983 claim. *See* Cal. Lab. Code § 1102.6[13]; *Anthoine*, 605 F.3d at 752 (9th Cir. 2010); *Settlegoode v. Portland Pub. Sch.*, 371 F.3d 503, 512 (9th Cir. 2004); *see also Mokler*, 157 Cal.App.4th at 138 (explaining that, where there is circumstantial evidence of retaliation, a burden-shifting approach is adopted with the second stage requiring a defendant to present "evidence of a legitimate nonretaliatory explanation for its acts," whereas when there is direct evidence of retaliation the burden-

---

[13] Under the Labor Code, that burden takes the form of a "clear and convincing evidence" standard. *See* Cal. Lab. Code § 1102.6 (indicating that the employer has "the burden of proof to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by Section 1102.5"). That standard of proof would have to be taken into consideration at this summary judgment stage. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

shifting analysis does not apply and "the defendant can avoid liability only by proving the plaintiff would have been subjected to the same employment decision without reference to the unlawful factor") (quoting *Morgan v. Regents of the Univ. of Cal.*, 88 Cal.App.4th 52, 67-68 (2000)). As such, at the summary judgment stage, Maywood and Myers would have to satisfy the *Shakur* standard to prevail on it. Their evidence is not sufficient to meet that burden at this summary stage. A trier of fact could clearly disbelieve the assertion that there was some reason, other than Plaintiff's protected activity, warranting Plaintiff's "release" or termination. *See, e.g., Settlegoode*, 371 F.3d at 510-11.

Maywood and Myers also argue that the proximity in time between Plaintiff's August 13 report to Myers (and the L.A. Times article published shortly thereafter) is not sufficient for purposes of causation,[14] citing to Seventh Circuit decisions for this point. Putting aside the fact that this Court is in the Ninth Circuit,[15] Plaintiff also has evidence that Myers (who had been in her job only two weeks when she "released" Plaintiff) was visibly shaken when he informed her of his actions, she gave neither Plaintiff nor anyone else any reason for the "release"/"termination" apparently until asked to do so in connection with this litigation, and a factfinder could easily determine that the reasons she is giving now are not worthy of credence. Therefore, even if the Court were inclined to follow the line of cases indicating mere proximity in time is not enough to show causation, it would have no application here. The Court cannot resolve this issue in Maywood's and Myers's favor at this summary judgment stage.

### 10. Is Myers Entitled to Qualified Immunity?

Myers argues that she should be entitled to qualified immunity on Plaintiff's section 1983 claim because it was not sufficiently clear to her that Plaintiff was a Maywood employee and because Plaintiff had no clearly established rights. As discussed

---

[14] Understood within the context of the five *Eng* questions, Maywood and Myers would be challenging Plaintiff's ability to demonstrate that his speech was a substantial and motivating factor in the adverse employment action, an issue on which Plaintiff bears the burden. *See Anthoine v. N. Cent. Cntys.. Consortium*, 605 F.3d 740, 750, 752 (9th Cir. 2010); *Ostad v. Or. Health Sciences Univ.*, 327 F.3d 876, 882 (9th Cir. 2003).

[15] *See, e.g., Coszalter v. City of Salem*, 320 F.3d 968, 977-78 (9th Cir. 2003) (reversing district court determination that adverse employment actions taken three to eight months after protected speech were too distant in time because "[w]hether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in the light of the timing and the surrounding circumstances" and application of bright-line rule on issue was inappropriate).

above, the defendants have not demonstrated that Plaintiff would be unable to make out a claim for violation of his First Amendment rights. Therefore, Myers may not prevail on what is normally considered the first step of the qualified immunity test (though there is no required sequence in application of those steps). *See Saucier v. Katz*, 533 U.S. 194, 201 (2011); *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) ("In determining whether a[ defendant] is entitled to qualified immunity, we employ a two-step test: first, we decide whether the [defendant] violated a plaintiff's constitutional right; if the answer to that inquiry is 'yes,' we proceed to determine whether the constitutional right was 'clearly established in light of the specific context of the case' at the time of the events in question.") (quoting *Robinson*, 566 F.3d at 821), *cert. denied*, 132 S.Ct. 2682 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

As to the second step, the Court would first note that Myers's position that she was reasonably mistaken about Plaintiff's employment status is seemingly somewhat inconsistent with her apparent view that she could "release" Plaintiff – even if not "terminate" him – without, apparently, consulting with anyone, either in Maywood or Bell. The facts were apparently clear enough to her to take that step at that stage. *See, e.g.*, *Kennedy v. City of Mayfield*, 439 F.3d 1055, 1061 (noting that *Saucier* court held that "if an officer makes a mistake in applying the relevant legal doctrine, he or she is not precluded from claiming qualified immunity so long as the mistake is reasonable"). Moreover, she argues now that one of the reasons she felt the need to "release" Plaintiff was so that he would not be considered Maywood's employee under the normal factors affecting such status (discussed above).

Second, Myers knew that Bell was not paying Plaintiff but that Plaintiff was still performing work on behalf of Maywood as he had done for years. In that light, to conclude that Myers had no reason to believe that Plaintiff could be considered Maywood's employee would be objectively unreasonable, or at least presents a question that is best resolved by a trier of fact. *See, e.g.*, *Wilkins v. City of Oakland*, 350 F.3d 949, 955 (9th Cir. 2003) ("[W]hether this mistake of fact was reasonable depends on which version of the facts is accepted by a jury.... [W]as it reasonable for [the officers] not to understand that the person they were shooting was another police officer? Because the answer to that question depends on disputed issues of material fact, it is not a legal

inquiry, but rather a question of fact best resolved by a jury."). If the facts surrounding Plaintiff's employment status are resolved in Plaintiff's favor, a factfinder could easily conclude that Myers should have been aware of Plaintiff's employment status with Maywood.

Third, Myers's argument is founded upon the contention that she can be liable only if Plaintiff was Maywood's employee (and that it should have been clear that she knew he was a Maywood employee). Yet, it is not entirely clear that *Myers* could not be held liable under section 1983 even if a jury determines *only Bell* was Plaintiff's employer. *See, e.g., Chudacoff v. Univ. Med. Ctr. of S. Nev.*, 649 F.3d 1143, 1150 (9th Cir. 2011); *Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 924 (9th Cir. 2011), *cert. denied*, 132 S.Ct. 1000 (2012); *Ibrahim v. Dep't of Homeland Sec.*, 538 F.3d 1250, 1257-58 (9th Cir. 2008); *Johnson v. Knowles*, 113 F.3d 1114, 1118 (9th Cir. 1997).

Finally, as a public employee,[16] there is no question that Plaintiff would have had a clearly established right not to be retaliated against for his First Amendment-protected conduct. *See, e.g., Karl v. City of Mountlake Terrance*, 678 F.3d 1062, 1073-75 (9th Cir. 2012); *Robinson*, 566 F.3d at 826; *Eng*, 552 F.3d at 1075; *see also Costanich v. Dep't of Soc. & Health Srvs.*, 627 F.3d 1101, 1114 (9th Cir. 2010) ("A right is 'clearly established' when 'the contours of the right were already delineated with sufficient clarity to make a reasonable offic[ial] in the defendant's circumstances aware that what he was doing violated the right.") (quoting *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001)). Moreover, by the time Myers acted, *Garcetti* was on the books and she would have (or should have) been aware that speech outside of an employee's job duties, on a matter of public concern, would likely enjoy protection. Even if the exact contours of Plaintiff's employment duties were not sufficiently defined such that Myers could not know exactly what speech activities fell within Plaintiff's First Amendment rights or even if the right must be defined at something more specific than "the right of a public employee to speak on issues of public concern without being retaliated against," it should have been obvious that at least Plaintiff's "speech" to the FBI and U.S. Attorney's Office would have been

---

[16] Plaintiff has also directed the Court to authority for the rule that First Amendment rights can be infringed even by the loss of a volunteer position. *See Hyland v. Wonder*, 972 F.2d 1129, 1135-36 (9th Cir. 1992).

protected.[17] *See Karl*, 678 F.3d at 1075 ("Notwithstanding *Garcetti*, we held in *Eng*, as we do here, that '[t]here could be no confusion...that when [plaintiff] commented upon matters of public concern as a citizen and *not* pursuant to his job responsibilities, his speech *was* protected by the First Amendment – that rule had long been the law of the land.'") (quoting *Eng*, 552 F.3d at 1075); *see also Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) ("[I]n an obvious case, [general] standards can 'clearly establish' the answer, even without a body of relevant case law."); *Robinson*, 566 F.3d at 826 ("[C]losely analogous preexisting case law is *not* required to show that a right was clearly established.") (emphasis added).

The Court declines to rule at summary judgment that Myers enjoys qualified immunity with respect to Plaintiff's section 1983 claim.

### 11. Plaintiff's Entitlement to a Minimum Wage

Maywood also argues that Plaintiff had no entitlement to a minimum wage, for purposes of his ninth claim for relief, because he was an exempt employee under the administrative exemption present in Wage Order 4-2001. Plaintiff correctly observes that Maywood's showing with respect to this argument is abbreviated at best. It has not met its burden as the moving party. The Court rejects Maywood's argument in this respect.

### 12. Is Myers Exposed to Punitive Damages?

Myers argues that she cannot be liable for punitive damages in her official capacity and that there is an insufficient factual basis for her liability because there are no valid underlying claims for compensatory damages against her and no conduct on her behalf rising to the necessary level of opprobrium to warrant such an award.

As set forth above, the section 1983 claim against Myers will survive this proceeding. In addition, Plaintiff notes that punitive damages are not uncommon in First Amendment retaliation cases. *See Settlegoode*, 371 F.3d at 516. "The Supreme Court has held that punitive damages may be assessed under 42 U.S.C. § 1983 when a defendant's conduct is shown to be motivated by evil motive or intent, or if it involves reckless or callous indifference to the federally protected rights of others." *Fair Housing of Marin v.*

---

[17] Maywood's and Myers's attempt to define the right (that they assert was not clearly established) as being whether an unpaid worker has a right not to be told, for retaliatory reasons, that his services are not needed, is improper because, in defining the right, it views the facts in the light most favorable to Maywood and Myers, not in the light most favorable to Plaintiff.

*Combs*, 285 F.3d 899, 906 (9th Cir. 2002) (citing *Smith v. Wade*, 461 U.S. 30, 56 (1983)). If it finds in favor of Plaintiff, a jury could determine that Myers's conduct rose to the level necessary to expose her to a punitive damages award. Myers therefore fails in that argument.

### 13. Supplemental Jurisdiction

Finally, Maywood and Myers ask that the Court decline supplemental jurisdiction over the remainder of this case if, indeed, they are successful in eliminating Plaintiff's section 1983 claim. They have not been successful in that regard. The issue is therefore moot.

### 14. Conclusion re Motion 1

The Court denies Motion 1 in its entirety.

## C. Motion 2

Maywood moves for partial summary judgment as to its first, second and seventh cross-claims pled against Bell (for breach of contract, express indemnity[18] and declaratory relief, respectively), meaning that it must satisfy the demanding *Shakur* standard as the moving party with the burden of persuasion.

### 1. Factual Background[19]

Due to its inability to obtain liability and worker's compensation insurance, the loss of its City Manager, and a desire to avoid bankruptcy, on June 3, 2010, Maywood

---

[18] "An indemnitee seeking to recover on an agreement for indemnification must allege the parties' contractual relationship, the indemnitee's performance of that portion of the contract which gives rise to the indemnification claim, the facts showing a loss within the meaning of the parties' indemnification agreement, and the amount of damages sustained." *Four Star Elec., Inc. v. F&H Constr.*, 7 Cal.App.4th 1375, 1380 (1992).

[19] Where "Disputed," Bell has stated only evidentiary objections, without identifying which part or parts of the proposed fact(s) is/are disputed, and without providing any citation to any opposing evidence. *See, e.g.*, BR ¶¶ 16, 21, 24, 26, 33. In addition, its evidentiary objections, as discussed further below, are not properly targeted or particularized. Maywood follows a not dissimilar course in certain situations. *See, e.g.*, MRBF ¶¶ 16, 18, 23. As a result, the Court would be within its power to deem proffered facts falling into this category as "undisputed."

The Court would also note that, unlike the situation where two *cross-motions* for summary judgment are involved, here Maywood has differing incentives on its two motions. As to the cross-dispute between Maywood and Bell, they are simply attempting to point fingers at each other, rather than to prove that Plaintiff has no claim. In light of this situation, the facts proffered in support of Motion 2, though they frequently overlap with the facts relevant to Motion 1, are not always consistent with the facts as proffered in support of Motion 1.

entered into a written agreement with Bell, which was later amended on June 21, 2010. *See* Cross-Defendant's City of Bell's [*sic*] Response to Maywood's Undisputed Material Facts and Statement of Material facts and Support Evidence [*sic*] in Support of its Opposition ("BR") (Docket No. 86-2) ¶¶ 1-2. Pursuant to that agreement and its amendment – the JMSA – Bell was to provide the general operations of all municipal services to Maywood and the implementation of City Council policies, including but not limited to human resources (all supervision and personnel functions), finance (administration of the fiscal budget and supervision of contract services, overall administration of financial operations, general accounting, grants administration), records management (maintenance of all official records and documents; preparation of agenda packets; certification of city documents), and Building and Safety services. *See* BR ¶ 2. The JMSA also obligated Bell to provide "building and planning services for Maywood" and "all labor and equipment, as necessary to perform the Services under this Agreement without any additional charge or compensation." *See* BR ¶ 5. The JMSA's terms and conditions became effective July 1, 2010. *See* BR ¶ 3.

Under the JMSA, Bell had "no authority, express or implied, to act on behalf of Maywood in any capacity whatsoever as an agent." BR ¶ 5. Bell also had "no authority, express or implied...to bind Maywood to any obligation whatsoever." BR ¶ 5. Bell was also obligated to "comply with all applicable laws in performing its obligations" under the JMSA. BR ¶ 8.

The JMSA also included an Indemnity provision in Section 14, as follows: "Bell hereby agrees to and does indemnify, defend, and hold harmless Maywood, and any and all of their [*sic*] respective officers, employees and representatives from any and all claims, liability and expenses, including attorneys fees and costs, that arise out of or are related to Bell's negligent performance of this Agreement." BR ¶ 6; Reply by Cross-Claimant, City of Maywood to Cross-Defendant City of Bell's Additional Material Facts in Support of its Opposition to Cross-Claimant's Motion for Partial Summary Judgment ("MRBF") (Docket No. 93) ¶ 10. In Section 15, Bell "assume[d] all responsibility for damages to property or injuries to persons...which may be caused by Bell's negligent, reckless or willful misconduct under this Agreement, whether such performance be by itself, or its agents, or whether such damage shall accrue or be discovered before or after

termination of this Agreement." BR ¶ 7. The JMSA provided for an award of reasonable attorneys' fees and costs to any prevailing party in "any action or proceeding...instituted for breach" of it. BR ¶ 9.

Due to the gravity of its situation, on June 30, 2010, Maywood terminated the employment of every one of its employees, including Plaintiff. *See* BR ¶ 14. Plaintiff had been Maywood's Director of Building and Planning up until that time. *See* MRBF ¶ 1. Spaccia was the interim City Manager for Maywood, loaned to it by Bell (where she had been Bell's Assistant City Manager) under the JMSA. *See* BR ¶ 15; MRBF ¶ 4. She negotiated with Plaintiff on behalf of Bell regarding the terms and conditions of Plaintiff's employment with Bell, which was to begin July 1, 2010 (the day after his termination from employment with Maywood). *See* BR ¶ 15.

Maywood asserts that Bell and Plaintiff entered into a written employment agreement beginning July 1, 2010. However, it has already been determined in this action that there is no such written agreement between Bell and Plaintiff. *See, e.g.*, MRBF ¶ 31; Docket No. 84. Because Maywood has prefaced this fact as involving a written agreement between Bell and Plaintiff, Bell has simply responded, in the context of this summary judgment motion, by way of ignoring any of the other purported undisputed facts Maywood has proffered about the employment relationship, if any, between Plaintiff and Bell. Among other things, this includes Plaintiff's title while working (if he did) for Bell, whether Maywood was a party to any agreement between Plaintiff and Bell, where Plaintiff would work and the nature of his duties after July 1, 2010, who was responsible for Plaintiff's salary and benefits during that time period, and whether Plaintiff was required to adhere to Bell's policies during that time period. *See* BR ¶¶ 17-19.

Bell does not dispute, however, that on July 19, 2010, Plaintiff visited Bell's City Hall and, with Bell's Clerk, completed and submitted employment applications for the position of Director of Development Services of the City of Bell and that he was then sworn in as a Bell employee. *See* BR ¶ 20. Bell's Clerk (Rebecca Valdez) also told Plaintiff that he would be paid for the work he performed. *See* BR ¶ 22. Nor does Bell appear to dispute that Bell did not pay Plaintiff for any work performed between July 1, 2010, and August 27, 2010. *See* BR ¶ 21. Bell also does not appear to dispute that it did not have individual written employment agreements with any former Maywood

employees who Bell nevertheless placed on its payroll and paid for services to Maywood starting July 1, 2010. *See* MRBF ¶¶ 23-24.

Plaintiff continued to work in Maywood, and to provide building and safety services to Maywood, from July 1, 2010, through August 27, 2010. *See* MRBF ¶ 5. However, Bell asserts that Plaintiff was not one of the employees it placed in Maywood pursuant to the JMSA. *See* MRBF ¶¶ 13, 25. The JMSA does not define Plaintiff's employment relationship with Bell, if any, and Plaintiff is not mentioned by name in any of the JMSA's provisions. *See* MRBF ¶ 20.

As of July 1, 2010, Bell also began placing employees or independent contractors in Maywood to provide Maywood municipal services, as required by the JMSA. *See* MRBF ¶ 11. Among those employees/contractors was an independent contractor, D&J Municipal Services, Inc. ("D&J"), which provided building and safety services to Maywood. *See* MRBF ¶ 12. There is no evidence that D&J ever employed Plaintiff, either directly or indirectly. *See* MRBF ¶ 28. Instead, it was the other former Maywood employees who had worked in the Building and Safety Department that were to be hired by D&J to continue providing building and safety services to Maywood starting July 1, 2010, pursuant to the JMSA. *See* MRBF ¶ 29.

In addition, Bell placed Spaccia in Maywood as Maywood's interim City Manager, placed Montoya as Maywood's Accounting Manager, and assigned other Bell employees to Maywood's Finance Department. *See* MRBF ¶ 22. Bell also hired certain entry-level position employees in Maywood's Parks and Recreation Department to provide Parks and Recreation services as of July 1, 2010. *See* MRBF ¶ 22.

Maywood was to pay to Bell a general municipal service fee in the amount of $50,833.33 as well as, among other fees, the City retainer services fee for engineers, hourly service fees for services rendered pertaining to public works permit and inspection, development review and control, public works projects, building and plan check and building inspection and permit technician services and hourly services fees for personnel to provide building and safety services, engineering services or planning services. *See* MRBF ¶ 15. Maywood paid Bell $80,833.33 on July 22, 2010. *See* BR ¶ 12. Bell's demand for payment from Maywood did not include any amounts to compensate Plaintiff for any services he performed for Maywood from July 1, 2010, through August 27, 2010.

*See* MRBF ¶ 30.

Maywood's City Council hired Myers as Interim City Manager on August 13, 2010. *See* BR ¶ 23. After being informed by Plaintiff that he had not been paid, Myers was unable to reach anyone at Bell between August 13, 2010, and August 27, 2010, in order to discuss the non-payment issue. *See* BR ¶ 25. On August 27, 2010, Myers told Plaintiff his services were no longer needed, or "released" him. *See* BR ¶ 27; MRBF ¶ 5. Bell had no involvement in this decision. *See* MRBF ¶ 6. Maywood asserts that Myers "released" Plaintiff (but did not "terminate" him) based on her observations of Plaintiff's deficiencies in his work habits and on the fact that Plaintiff did not have a written employment contract with Bell or Maywood. *See* MRBF ¶¶ 7, 32.

On May 17, 2012, Maywood made a demand that Bell defend and indemnify Maywood in its defense against Plaintiff's lawsuit, but Bell refused to do so. *See* BR ¶ 32.

### 2. Maywood is Not Entitled to Partial Summary Judgment

Maywood argues that Bell was obligated to pay Plaintiff his salary[20] and that its failure to do so breached the JMSA, to which Maywood and Bell were parties. As such, Maywood asserts that it was entitled to a defense and indemnification from Bell under the terms of that agreement. Yet, Bell has presented reason to question whether Plaintiff was necessarily covered by Bell's obligations under the JMSA (a question that is at least somewhat at the heart of the surviving dispute between Plaintiff and Bell in this case). Even ignoring that question, however, Maywood cannot dispute that Bell's indemnification obligation is pegged to it having *negligently* performed the agreement. As a condition precedent to any indemnification obligation – and one which a trier of fact seemingly must resolve – it is not clear how Maywood expects the Court to resolve the issue as a matter of law at this point in time short of it concluding that Bell not only did not perform the agreement properly, but that it *negligently* performed it.[21] Maywood appears to

---

[20] Whereas Maywood eschews any application of an employer-employee analysis contemplated by, among other sources, *Martinez* when it comes to the question of Maywood's employer status *vis a vis* Plaintiff, it affirmatively asserts that Bell should be held to that standard when the question of its own employment of Plaintiff is at issue.

[21] If Maywood instead wants the Court to determine what rights it had under the JMSA *assuming* Bell is determined to have negligently performed the agreement, it essentially asks that the Court engage in the types of speculative resolution of non-present conflicts that courts are generally loathe to do, at least in connection with declaratory relief claims.

recognize as much in its motion. *See* Maywood's Opening Brief (Docket No. 72), at 19:5-8 (setting for the elements of a negligence claim).

Maywood asserts that Bell was negligent in its failure to properly process Plaintiff's employment paperwork, to actually pay him when it knew he was performing work, and to be available to Myers when she tried to contact Bell to sort the situation out. These are all strong arguments which, if believed, could very well lead to a factfinder determining that Bell had performed the agreement – if it applies to Plaintiff at all – in a negligent manner. At this stage, however, that is purely a hypothetical. If the factfinder does not determine that the JMSA covers Plaintiff and that Bell performed the agreement negligently, Maywood's request that the Court determine its rights if indeed Plaintiff was covered thereby and Bell performed negligently becomes a moot point.

Moreover, it is not even clear that Maywood's contractual rights under the JMSA would necessarily even come into play even assuming Bell should have paid Plaintiff. If Bell was obligated to pay Plaintiff, not because he was covered by Bell's agreement with Maywood but because Bell would have been considered Plaintiff's employer by way of some other means of defining that relationship, it is somewhat difficult to understand how its actual failure to pay him could be deemed to arise out of Bell's negligent performance of its agreement with Maywood as opposed to its simple failure to pay due attention to those other principles governing employer-employee relationships.

Maywood also takes the position that it would not have been sued had Myers not "released" Plaintiff because of Bell's failure to live up to its obligations to employ and pay Plaintiff. That takes a somewhat circumscribed view of the allegations and facts underlying this case and presupposes that a trier of fact would agree with Maywood that there was no other more-nefarious reason for Myers to "release" Plaintiff – such as in response to his First Amendment and/or whistleblowing activity. In other words, a trier of fact could readily determine that Maywood (and Myers) would have been sued regardless of Bell's alleged failure to properly process Plaintiff's employment arrangements.

In short, just who (if anyone) is legally responsible for Plaintiff's non-payment is an open question in this litigation. Whereas Plaintiff is, seemingly by all accounts, the least responsible for the situation, by virtue of their various motions, both Maywood and Bell are attempting to wash their hands of the problem and to leave Plaintiff having done

all the work for zero remuneration.

For the above reasons, Maywood's motion for partial summary judgment is denied.

### D. Evidentiary Objections

    1. <u>Plaintiff's Objections to Motion 1 Evidence</u>

        a. *Myers Decl.*

        1.  Overrule.

        2.  Overrule.

        3.  Overrule.

        b. *May Decl.*

        4. Overrule.

        c. *Myers Depo.*

        5. Overrule.

        6. Overrule.

        7. Overrule.

        8. Overrule.

        9. Overrule.

        10. Overrule.

        11. Overrule.

        12. Sustain.

        13. Overrule.

        d. *Aguirre Depo.*

        14. Overrule.

        15. Overrule.

        e. *Valdez Depo.*

        16. Overrule.

    2. <u>Maywood/Myers Objections to Motion 1 Evidence</u>

        a. *Plaintiff's Decl.*

        1.  Overrule.

        2.  Overrule.

        3.  Overrule.

4. Overrule.

5. Overrule.

6. Overrule.

7. Overrule.

8. Sustain.

9. Overrule.

10. Overrule.

11. Overrule.

12. Overrule.

13. Overrule.

14. Overrule.

15. Overrule.

16. Overrule.

17. Overrule.

18. Overrule.

19. Overrule.

20. Overrule.

21. Overrule.

22. Overrule.

23. Overrule.

24. Overrule.

25. Sustain to the extent Plaintiff attempts to characterize article; otherwise overrule.

26. Overrule.

27. Overrule.

28. Overrule.

29. Overrule.

b. *Spaccia Decl.*

30. Overrule.

30a. Sustain (best evidence).

31. Overrule.

32. Overrule.

33. Overrule.

34. Sustain.

35. Sustain as to contents of contract (best evidence); otherwise overrule.

36. Overrule.

37. Overrule.

38. Overrule.

   c. *Pánuco Decl.*

39. Overrule.

40. Sustain.

41. Sustain.

42. Sustain.

43. Sustain.

44. Overrule.

3. <u>Bell's Objections to Motion 2 Evidence</u>[22]

   1 through 9 - Overrule.

4. <u>Maywood's Objections to Motion 2 Evidence</u>

   a. *Valdez Decl.*

   1 through 3 - Sustain.

---

[22] For the second time in this case, the Court advises Bell, in particular, that it resolves only objections to *evidence*, not to statements of purported fact in the parties' separate statements. *See* Docket No. 84, at 5 n.6. Because Bell has again failed to heed that guidance, all of its objections are overruled, even if those objections, directed at actual discrete pieces of evidence, would have merit.